UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Case No. 2:21-cr-053 |
| v. | : Chief Judge Algenon L. Marbley |
| RONALD LEE JACOBS, | : |
| Defendant. | : |

**OPINION & ORDER**

This matter is before the Court on the parties' Motions in Limine (ECF Nos. 34, 41, 50, 64, 65, 70, 71, 72, 73, 74). As detailed below, Defendant's Motion to Admit Evidence for Impeachment (ECF No. 50) is **GRANTED IN PART**. All remaining Motions are **DENIED**.[1]

### I. STANDARD OF REVIEW

The purpose of a motion in limine is "to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). "Whether or not to grant a motion in limine falls within the sound discretion of the trial court." *Delay v. Rosenthal Collins Grp., LLC*, 2012 WL 5878873, at *2 (S.D. Ohio Nov. 21, 2012) (citing *Branham v. Thomas M. Cooley Law Sch.*, 689 F.3d 558, 562 (6th Cir. 2012)). The guiding principle is "to ensure evenhanded and expeditious management of trials." *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).

"A court should exclude evidence on a motion in *limine* only when that evidence is determined to be clearly inadmissible on all potential grounds." *Delay*, 2012 WL 5878873, at *2

---

[1] This Opinion does not address other pretrial motions relating to Defendant's confession (ECF Nos. 36, 53), the expert testimony of Dr. Richard Leo (ECF Nos. 61, 77, 99), and the recently disclosed jail calls (ECF No. 102). Those matters will be resolved separately.

1

(citing *Ind. Ins. Co.*, 326 F. Supp. 2d at 846). The burden rests on the movant. *Morrison v. Stephenson*, 2008 WL 343176, at *1 (S.D. Ohio Feb. 5, 2008). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846. Furthermore, "[o]rders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975); *see also Morrison*, 2008 WL 343176, at *1 ("Courts . . . are generally reluctant to grant broad exclusions of evidence *in limine*, because a court is almost always better situated during the actual trial to assess the value and utility of evidence." (internal quotation marks omitted)).

## II.  LAW AND ANALYSIS

Defendant submitted nine Motions in Limine (ECF Nos. 34, 50, 64, 65, 70, 71, 72, 73, 74) and the Government one (ECF No. 41). The Court will address these Motions in turn, grouping matters that are thematically related.

### A.  *Jencks* Material (ECF No. 34)

Defendant's first Motion in Limine seeks discovery of Government witnesses' statements, pursuant to *Jencks v. United States*, 353 U.S. 657 (1957), and the eponymous Jencks Act, 18 U.S.C. § 3500, for purposes of impeachment. (ECF No. 34). The Jencks Act requires production of such statements only after the Government witness has testified on direct examination, *see* 18 U.S.C. § 3500(b); but Defendant requests pretrial production "to avoid unnecessary delays during trial." (ECF No. 34 at 5). In response, the Government represents that it "has already provided all witness-statement summaries to the defendant" and intends to provide any remaining *Jencks* material "no later than the Friday before the current-scheduled Monday trial date." (ECF No. 40 at 2).

2

While the Sixth Circuit recognizes "the better practice . . . is for the government to produce [*Jencks*] material well in advance of trial so that defense counsel may have an adequate opportunity to examine that which is not in dispute," *United States v. Minsky*, 963 F.2d 870, 876 (6th Cir. 1992), pretrial disclosure is not required by the Jencks Act. Thus, this Court has held "that the Government is not compelled to disclose [*Jencks* statements] unless and until [the witness] has testified on direct examination at trial." *United States v. Abdi*, 498 F. Supp. 2d 1048, 1075 (S.D. Ohio 2007) (Marbley, J.). Because Defendant cannot compel the early production of *Jencks* material, his Motion (ECF No. 34) is **DENIED**.

Of course, the Government can consent to an earlier schedule of disclosures than the statute requires—and it did so at the Final Pretrial Conference on May 17, 2022. The Court will hold the parties to that agreed-upon schedule. At the Conference, the Government reiterated its intent to exchange remaining *Jencks* material by the Friday before trial. If any *Jencks* material is not exchanged at that time, neither party opposed defaulting to the Court's usual practice: *Jencks* material will be provided, together with the list of the next day's witnesses, the evening before the witness is called to testify, unless the Government can show that doing so would imperil the witness's safety.

### B. Impeachment Evidence (ECF No. 50)

Next, Defendant moves to admit impeachment evidence against Detective Agee of the Columbus Division of Police ("CPD"), who investigated the robberies at issue and obtained the contested confession from Defendant. (ECF No. 50). Defendant seeks to admit evidence of twelve citizen and law enforcement complaints against Detective Agee that were sustained by CPD's Internal Affairs Bureau ("IAB"). (*Id.* at 4). The Government does not object to two IAB findings—

those that "sustain[ed] allegations of incorrect and/or missing information"—but does object to the remaining ten. (ECF No. 62 at 3).

Under Federal Rule of Evidence 608(b), the Court may allow inquiry on cross-examination into "specific instances of a witness's conduct . . . if they are probative of the [witness's] character for truthfulness or untruthfulness." Defendant contends that all twelve sustained complaints are probative of Detective Agee's truthfulness and credibility and thus should be admitted under Rule 608(b). (ECF No. 50 at 4).

Beyond the two incidents that the Government concedes, Defendant's Motion gives the Court limited context with which to assess the other sustained complaints. Per Detective Agee's Employee Record, those complaints concern "Rude or Discourteous Language or Actions," (ECF No. 50-1 at 2); "Actions Taken / Not Taken," (*Id.* at 7); "Investigative Actions," (*Id.* at 8, 11); "Force," (*Id.* at 13–14); "Violation of Police Rules, Orders, Etc" (*Id.* at 14–15, 30, 34, 39, 42); "Striking Weapon" (*Id.* at 40); and "Injury during arrest" (*Id.* at 41). No further details are provided, either in the report or the Motion.

The Court declines to hold that *any* past misconduct would be admissible under Rule 608(b). That would open the door to general maligning of the witness, whereas Rule 608(b) specifically limits the inquiry to matters "probative of the [witness's] character for truthfulness or untruthfulness." From the categories alone, some complaints potentially would be probative of truthfulness (*e.g.*, "Violation of Police Rules, Orders, Etc"), while others appear more removed (*e.g.*, "Injury during arrest"). Yet, absent additional information about the other sustained allegations, the Court is left to speculate which fall within that category of permissible topics for cross-examination.

4

As a final caveat, the IAB documents themselves will not be admitted into evidence, as Defendant's Motion might be read to request. Rule 608 permits inquiry on cross-examination, but it is not a backdoor to admit extrinsic documents into evidence. *See United States v. Craig*, 953 F.3d 898, 903 (6th Cir. 2020) ("Rule 608(b) by its terms prohibits the use of extrinsic evidence. Under that Rule, we have allowed a questioner to ask about extrinsic documents during cross-examination and show them to the witness, but not to publish the documents to the jury.").

Accordingly, Defendant's Motion (ECF No. 50) is **GRANTED IN PART** as to the two sustained complaints (IAB numbers 201201-96 and 201201-281) that, by the Government's concession, could bear on Detective Agee's credibility. Defendant may inquire into those reports on cross-examination. Defendant's Motion is **HELD IN ABEYANCE** as to the remaining complaints. Defendant may attempt to show at trial that those complaints are appropriate for cross-examination, and the Court will rule once it has assessed their contents.

### C. Identifications from Surveillance Footage (ECF Nos. 64, 65)

Defendant brings a pair of Motions to preclude testimony identifying objects in surveillance footage: one regarding identification of firearms (ECF No. 64), and another regarding identification of clothing stains (ECF No. 65). Defendant contends that both categories of evidence are inadmissible because "such testimony is not based on first hand knowledge" and thus is barred by Rules 701 and 702. (ECF No. 64 at 1; No. 65 at 1). He maintains that the jury can see and interpret the surveillance footage on its own, leaving "no basis for permitting in evidence the testimony or opinions of law enforcement officers as to what the video depicts." (*Id.*). "The only witnesses that can properly testify at trial," Defendant states, "would be witnesses at the scene of the robberies that had an opportunity to see the robbery and to view any of the objects used in

connection with the robbery." (ECF No. 64 at 4; No. 65 at 4). The Government opposed these Motions in its omnibus response. (ECF No. 86 at 2–4).

At the outset, the Court may dispense with Defendant's arguments under Rule 702, which concerns expert testimony. The Government states it does not intend to call a "clothing stains expert," and it makes no mention of a firearms identification expert. (*Id.* at 2–3). The Government's Notice of Expert Witnesses lists only latent print examiners, who would testify regarding fingerprint identifications. (ECF No. 76). Thus, the opinions to be offered, if any, would be lay witness opinions under Rule 701. Such opinions are admissible if they are "rationally based on the witness's perception," are "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and are "not . . . within the scope of Rule 702." Fed. R. Evid. 701.

Notably, Rule 701 does permit law enforcement to testify based on information gained during an investigation. "[W]hen an agent relies on his or her personal knowledge of a particular investigation, the agent's opinion may be lay opinion testimony under Rule 701." *United States v. Kilpatrick*, 798 F.3d 365, 384 (6th Cir. 2015). Application of the personal knowledge requirement, a product of Rule 602, is illustrated in *United States v. Donald*. There, the court found that a law enforcement officer's testimony identifying a suspect from surveillance footage "was properly admitted," even though the officer was not present at the scene, because the testimony "was based on his personal observations and conclusions made during the course of his investigation." 86 F. App'x 939, 943 (6th Cir. 2004).

Defendant's citations to *United States v. Freeman* are not to the contrary. There, the court held that the government failed to lay a proper foundation under Rule 701 for a special agent's testimony interpreting phone conversations. 730 F.3d 590, 596 (6th Cir. 2013). The court noted that the agent "repeatedly substantiated his responses and inferences with generic information and

6

references to the investigation as a whole," and "never specified *personal* experiences that led him to obtain his information." *Id.* In *Kilpatrick*, where "[e]ach agent testified on multiple occasions concerning his or her years-long personal involvement in the case, including interviewing dozens of witnesses, reading scores of relevant documents and thousands of text messages, and listening to recorded phone calls," *Freeman* was distinguishable. *Kilpatrick*, 798 F.3d at 381. Here, given Detective Agee's personal involvement in the investigation, a proper foundation is possible. The court in *Freeman* also found the agent had "effectively spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language," thus infusing his testimony with "many opinions and conclusions the jury was well equipped to draw on their own." *Freeman*, 730 F.3d at 597. Here, by contrast, the apparent reason for offering identification testimony is that the surveillance footage is not entirely clear in what it depicts—but, as in *Donald*, can be contextualized with other information gained through the investigation.

In conclusion, both Motions come down to a question of foundation. If the Government lays a proper foundation at trial, law enforcement officers may rely on personal knowledge garnered through the investigation to contextualize the surveillance footage—subject, of course, to a probing cross-examination. This would not exceed the scope of Rule 701 and would not invade the province of the jury. Accordingly, Defendant's Motions (ECF Nos. 64, 65) are **DENIED**.

### D.  Jail Calls and Video Statement (ECF No. 71)

Defendant's next Motion is to exclude several of his statements in recorded jail calls and the interrogation video. (ECF No. 71). The Government opposes exclusion of the jail calls but is agreeable to redaction of the interrogation video. (ECF No. 86 at 4–7).

7

Regarding the jail calls, Defendant argues for exclusion under Rules 401 (relevance), 801 (hearsay), and 403 (unfair prejudice). The calls record Defendant's conversations with his parents, girlfriend, wife, and son, occurring between November 4 and 7, 2020. (ECF No. 71 at 2). While parts of the conversations concern purely personal matters, others hint at a financial motive for the alleged crimes ("Two words . . . Child Support") and admit "I f–d up." (*Id.* at 2–3). These statements have at least some bearing on facts of consequence in this case—for instance, identity and intent—making them relevant. *See* Fed. R. Evid. 401. Defendant's relevance challenge therefore is rejected.

Turning to hearsay, Defendant properly identifies the jail calls as out-of-court statements offered for the truth of the matter asserted. (ECF No. 71 at 4, citing Fed. R. Evid. 801). Nonetheless, Rule 801(d)(2) specifies an exclusion for opposing-party statements, which are made by a party and offered against him at trial. Defendant contends that the rule is limited to "inculpatory statements" (ECF No. 71 at 4). That position, however, finds no support in Defendant's cited authority, *United States v. McDaniel*, which held only that the hearsay exclusion "does not extend to a party's attempt to introduce his or her *own* statements through the testimony of other witnesses." 398 F.3d 540, 545 (6th Cir. 2005). In fact, the court in *McDaniel* rejected the defendant's attempt to craft an inculpatory/exculpatory distinction, noting "that the admissibility of a statement under Rule 801(d)(2) does not hinge . . . on whether or not the statement is against the party-declarant's interest." *Id.* at 545 n.2. Defendant's statements fall within Rule 801(d)(2) because there were made by him and will be offered against him at trial. The hearsay challenge therefore is rejected.

Finally, the Court finds no unfair prejudice in the jail call statements—at least those that are identified specifically in the briefing. Defendant contends that "statements made by Mr. Jacobs

8

in the jail calls regarding his child support, financial woes, [and] prior criminal history . . . run the risk of jurors making decisions based on propensity and not the relevant legal issues." (ECF No. 71 at 5). Propensity evidence is a recognized source of unfair prejudice, but it typically entails "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The statements about child support and financial woes do not fit this mold. Statements about Defendant's prior criminal history likely would, *cf.* Fed. R. Evid. 404(b); but the Motion does not identify any such statements embedded in the jail calls. For present purposes, the Court holds that the statements identified in the jail calls are suggestive of motive, not propensity, and do not present a risk of unfair prejudice under Rule 403. To the extent the jail calls disclose Defendant's prior incarceration, the Court will entertain a timely objection in the context of specific proffered statements.[2]

Because the statements at issue are relevant, fall under a hearsay exclusion, and do not risk unfair prejudice, Defendant's Motion (ECF No. 71) is **DENIED** as to the jail calls.

Regarding the interrogation, Defendant requests that statements regarding his criminal history be redacted from the video and transcript, in the event this Court denies his motion to exclude the confession in full. (*Id.* at 1; *see also* ECF No. 36). "The government agrees" with the redaction request "and intends to display, and elicit testimony regarding, a version of his interview that excludes any statements that relate to [Defendant's] prior criminal conduct." (ECF No. 86 at 4). At the Final Pretrial Conference of May 17, the Court indicated it would grant Defendant's request for redaction of the interrogation video and transcript. Subsequently, at the evidentiary

---

[2] The parties are advised that the Court intends to resolve all issues related to Defendant's criminal history strictly outside the presence of the jury, in order to avoid a curative instruction. If any statements in the jail calls do reveal Defendant's prior incarceration, this should be raised to the Court *before* such statements are introduced.

hearing of May 19, the Court granted Defendant's Motion to Exclude Confession. Since the confession will be suppressed, the interrogation video and transcript will not come into evidence, and the redaction issue is **MOOT**.

### E. In-Court Identification (ECF No. 72)

Another of Defendant's Motions seeks "to preclude the Government from eliciting in court identification of Mr. Jacobs from witnesses who have not previously identified Mr. Jacobs outside of court." (ECF No. 72 at 1). The Government opposed this Motion in its omnibus response, stating it "has no plans to elicit in-court identification from any witness in this case who does not already know the defendant or who had not already met the defendant." (ECF No. 86 at 7–8).

Every case cited by Defendant concerns the admissibility of pretrial identifications from suggestive police lineups or photo arrays, *see Perry v. New Hampshire*, 565 U.S. 228, 239 (2012); *Pittao v. Hoffner*, 722 F. App'x 474, 477 (6th Cir. 2018); *Gregory v. City of Louisville*, 444 F.3d 725, 746 (6th Cir. 2006); or the right to have counsel present during an identification procedure, *see Moore v. Illinois*, 434 U.S. 220, 229 (1977). At a high level, these cases hold that "due process concerns arise . . . when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry*, 565 U.S. at 238–39. In that event, courts must "assess, on a case-by-case basis," the "[r]eliability of the eyewitness identification" and "whether improper police conduct created a substantial likelihood of misidentification." *Id.* at 239 (alterations incorporated, internal quotation marks omitted).

Defendant's Motion does not support the leap from these lineup cases to a bar on in-court identification. The *Donald* case, offered by the government, appears more on point. It held that a law enforcement officer could make the very identification at issue here: "that the person captured on the videotape was the person who robbed the bank . . . based upon the description of the suspect"

and the officer's "personal observations and conclusions made during the course of his investigations." 86 F. App'x at 943.

Defendant argues "[s]uch an identification would be inherently suggestive" (ECF No. 72 at 3); but even if the lineup cases do apply, their inquiry does not end at suggestiveness. Rather, they look to necessity, reliability, and likelihood of misidentification. *See Perry*, 565 U.S. at 238–39. All appear satisfied. In-court identification will be necessary to prove identity, a contested element. The Government intends to call witnesses who could make a reliable identification because they "already know the defendant." (ECF No. 86 at 7–8). Consequently, the testimony proposed here does not present the same risk of misidentification as with, for instance, an eyewitness who viewed the assailant once in a brief window.

For these reasons, the in-court identification procedure proposed by the Government is permissible. Defendant's Motion (ECF No. 72) is **DENIED**.

### F. Fingerprint Evidence (ECF No. 73)

Next, Defendant moves to exclude fingerprint evidence under Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (ECF No. 73 at 1). The Government again opposes. (ECF No. 86 at 8–9).[3]

Together, Rule 702, *Daubert*, and *Kumho Tire* establish that district courts may admit expert testimony if it satisfies three requirements. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (describing the district courts' "responsibility of acting as gatekeepers to exclude unreliable expert testimony"). "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'" *Id.* at 529 (quoting Fed. R. Evid. 702). "Second, the testimony

---

[3] The Court has resolved this Motion on the papers and without a *Daubert* hearing. *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999) ("[T]he trial court is not required to hold an actual hearing to comply with *Daubert*," but must "make an initial assessment of the relevance and reliability of the expert testimony.").

11

must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting Fed. R. Evid. 702). "The relevance requirement ensures that there is a 'fit' between the testimony and the issue to be resolved by the trial." *Greenwell*, 184 F.3d at 496. "Third, the testimony must be reliable." *Scrap Metal Antitrust Litig.*, 527 F.3d at 529. The reliability requirement "focus[es] on the methodology and principles underlying the testimony." *Greenwell*, 184 F.3d at 496–97. The "proponent" of the expert testimony "must establish its admissibility by a preponderance of the proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

Defendant attacks the reliability element, arguing that "[t]he examination and identification of fingerprints is a completely subjective test." (ECF No. 73 at 5). Defendant notes "there has never been any testing conducted to establish the reliability of identification[s] which are made from small distorted latent fingerprint fragments," and consequently, "there are no known error rates for latent fingerprint examiners." (*Id.* at 4). Defendant cites two academic papers for these assertions: National Institute of Justice, *Solicitation: Forensic Friction Ridge (Fingerprint Examination Validation Studies)* March 2000, https://www.ojp.gov/sites/g/files/xyckuh241/files/archives/ncjrs/sl000386.pdf?msclkid=238d1ba7c4fd11ec81f872354c2c8f3; and Lyn Haber & Ralph Norman Haber, *Error Rates for Human Latent Fingerprint Examiners*, in Automatic Fingerprint Recognition System 339, 358 (Nalini K. Ratha & Ruud Bolle eds., 2004).

In response, the Government argues that fingerprint identification has a "long history of acceptance in the courts," and observes that "a number of courts in this Circuit have made quick work of these kinds of wholesale attacks on fingerprint evidence." (ECF No. 86 at 8–9). The Government points first to *United States v. Stone*. There, the court rejected the defendant's "wholesale attack on latent fingerprint identification evidence in general," reasoning that "[s]uch

12

an unspecified challenge to a well-established area of expertise does not warrant a *Daubert* hearing." 848 F. Supp. 2d 714, 717 (E.D. Mich. 2012); *see also id.* at 717–19 (compiling authorities from the First, Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth Circuit Courts of Appeals). The Government next cites *United States v. Cromer*, where the court rejected a similar reliability challenge in short shrift. 2006 WL 1430210, at *1 (W.D. Mich. May 23, 2006). The court adopted the reasoning of *United States v. Mitchell*, 365 F.3d 215, 219 (3d Cir. 2004), where "the Third Circuit held . . . that latent fingerprint identification evidence [via] expert testimony passes muster under *Daubert* and FRE 702." *Cromer*, 2006 WL 1430210, at *1.

It would be a drastic measure for this Court to hold that fingerprint identification fails the reliability threshold in *Daubert*. Defendant appears to acknowledge that point, conceding that "[a]dmissibility of expert testimony based upon fingerprint evidence to prove identity is well established in every jurisdiction in the United States." (ECF No. 73 at 3). Tellingly, the articles Defendant cites in support of exclusion are each about twenty years old; yet, Defendant has identified no cases where a court adopted their reasoning and excluded fingerprint identifications as unreliable. From *Stone*, *Cromer*, and the authorities cited therein, the Court concludes this is an "ordinary case[] where the reliability of an expert's methods is properly taken for granted." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Any potential fallibility in fingerprint identification is a matter for cross-examination, not a bar to admissibility. Thus, the Court being satisfied as to the reliability of fingerprinting evidence, Defendant's Motion (ECF No. 73) is **DENIED**.

### G.  Jury Instructions (ECF Nos. 70, 74)

Defendant's remaining two Motions concern the Court's preliminary and final jury instructions. The Court will address these together.

First, Defendant moves to have prospective jurors instructed on unconscious bias. (ECF No. 74). He asks to show a YouTube video—"What Would You Do? Bike Theft (White Guy, Black Guy, Pretty Girl)"—during voir dire "in order to engage the jurors in a conversation about unconscious bias." (*Id.* at 3). He also asks that prospective jurors be required to complete a supplemental questionnaire on racial attitudes and that the Court issue a preliminary jury instruction on unconscious bias. (*Id.* at 4–5; questionnaire attached as ECF No. 74-1). The Government takes no position on this Motion; "it defers to the Court." (ECF No. 86 at 10).

All these requests would require the Court to deviate from its standard practices. The Court typically does not permit demonstratives during voir dire, does not order supplemental juror questionnaires, and reads from a usual script of preliminary instructions. Adherence to these standard practices, which have been developed over years of trial experience, promote fairness and consistency across cases.

Of course, unconscious bias is an important issue, implicating Defendant's constitutional right to a fair and impartial jury, which Defendant will have ample opportunity to broach at voir dire. The Court will take the matter of a preliminary instruction under advisement. As to the additional measures, however, Defendant's Motion (ECF No. 74) is **DENIED**.

Finally, Defendant moves the Court to instruct jurors on the law prior to closing arguments. (ECF No. 70). This would enable both parties "to use and reference the jury instructions during their closing arguments while not confusing the jurors." (*Id.* at 2). Defendant relies on Federal Rule of Criminal Procedure 30(c), which permits the Court to instruct the jury "before or after the arguments are completed, or at both times." The Government takes no position; it "defers to the Court's standard procedures." (ECF No. 86 at 4).

The standard practice in this Court, permitted by Rule 30(c), is to instruct jurors after closing arguments. The Court will not deviate here, so Defendant's Motion (ECF No. 70) is **DENIED**.

### H. Intrinsic Evidence (ECF No. 41)

The Government's sole Motion in Limine seeks to admit evidence of additional robberies as intrinsic evidence, or alternatively, as "other acts" evidence under Rule 404(b). (ECF No. 41). Defendant objects to the evidence under either characterization. (ECF No. 87). Specifically, the Government intends to introduce evidence related to seven uncharged robberies: at the Hampton Inn and Suites, 2093 S. Hamilton Road, on July 24, 2020; at the Duke and Duchess, 3458 S. Hamilton Road, on September 5, 2020; at the Dollar General, 8915 E. Broad Street, on September 17, 2020; at the Holiday Inn Express, 4041 Hamilton Square Blvd., on September 18, 2020; at the Shell gas station, 4733 Morse Road, on September 25, 2020; at the Advance Autoparts, 1205 E. Main Street, on October 5, 2020; and at the Dollar Tree, 3632 E. Main Street, on October 19, 2020. (ECF No. 41 at 2–4). These are distinct from the six robberies charged in the superseding indictment.

Citing *United States v. Barnes*, the Government contends these uncharged robberies are "part of a single criminal episode" or "a continuing pattern of illegal activity," and thus are "'inextricably intertwined' with evidence of the crime charged in the indictment." 49 F.3d 1144, 1149 (6th Cir. 1995) (quoted by ECF No. 41 at 5). If these robberies are not deemed "intrinsic evidence," then the Government alternatively asserts that they "demonstrate a common motive, intent, preparation, plan, knowledge, and identity," and thus are admissible under Rule 404(b). (ECF No. 41 at 8).

Before reaching the intrinsic/extrinsic distinction, however, there is a conditional relevance problem, which is a matter for the Court to resolve under Rule 104. The uncharged robberies are relevant to the crimes in the indictment only if the assailant can be identified either as Defendant or, at a minimum, as the same assailant in the charged robberies. Otherwise, the surveillance footage shows nothing more than an unidentified robber who could not be linked to Defendant in any way. "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). In making this determination, "[t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Huddleston v. United States*, 485 U.S. 681, 690 (1988).

On the record presently before the Court, the Government has not shown that the uncharged robberies are relevant. By the Government's description, the assailant in each uncharged robbery is a Black male of average height and build who entered commercial establishments wearing nondescript dark clothing and a facial covering, then demanded money at gunpoint, sometimes concealing the weapon with a shirt or bandana. (ECF No. 41 at 2–4). Only one robbery description has any identifying features: a "paint-splattered" sweatshirt that the Government would argue matches or resembles the clothing recovered from Defendant. (*Id.* at 3). In another, the store clerk, who saw the assailant firsthand, identified him as a white male. (*Id.* at 2).[4]

Defendant argues, and the Court agrees, that these "broad descriptors[] would implicate a significant portion of males in the African American, Caribbean, continental African and Sub-

---

[4] The Government maintains that Defendant implicated himself during Detective Agee's interrogation (*Id.*), but Defendant contests this. (ECF No. 86 at 5). The Court has reviewed the transcript and sees no express admission to that uncharged robbery. *See* ECF No. 53-1, Tr. 46:13–19, 49:14–50:1 (Detective Agee: "So you remember doing the Hampton Inn twice though, correct, with a shotgun?" Defendant: "Honestly, I don't even remember half of the things I did.").

16

Saharan communities in the city of Columbus and its suburbs." (ECF No. 87 at 5). The uncharged robberies also are spread across a wide area of eastern and southeastern Columbus, with one occurring minutes from downtown and others as far out as Groveport, Gahanna, and Reynoldsburg. (ECF No. 41 at 2–4). And the pattern of approaching a store clerk with a concealed weapon is closer to Robbery 101 than to a *modus operandi*, which requires "striking" similarity and a "'signature'" method across the various crimes. *United States v. Joseph*, 270 F. App'x 399, 406 (6th Cir. 2008) (quoting *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006)). As Defendant put it: "What they have in common is the fact that they were robberies. That is all." (ECF No. 87 at 3). There simply are not enough commonalities, at least on the present record, to link those robberies to the charged offenses. The Government presumably recognized this when it declined to charge the other seven robberies in the superseding indictment. Surely if the Government believed it had evidence to connect Defendant to these uncharged robberies—whether by surveillance footage or through a tacit admission in the interrogation—then these crimes would be charged.

Thus, the Court finds under Rule 104(b) that the Government at this time has not offered sufficient evidence, by any burden of proof, that would connect Defendant to the uncharged robberies. Absent that condition, the evidence is not relevant to the charged offenses and is not admissible at trial—regardless of whether the evidence is deemed to be "intrinsic" or "extrinsic." *See United States v. Clay*, 667 F.3d 689, 698 (6th Cir. 2012) (purchase of firearm, allegedly a prelude to a later carjacking, was not intrinsic evidence because no "confirmed link" existed "between the prior act and the charged offense"); *United States v. Adams*, 722 F.3d 788, 822 (6th Cir. 2013) (other-act evidence was inadmissible under Rule 404(b) for lack of "sufficient evidence that [the defendant] committed the act" (quoting *Clay*, 667 F.3d at 699)).

Moreover, even assuming the Government could make out more than a tenuous connection to the charged offenses, Defendant identifies a separate problem under Rule 403: testimony on the uncharged offenses risks confusing the issues or misleading the jury. (ECF No. 87 at 7–8). The jury already must keep track of six robberies and will be instructed "to evaluate reasonable doubt separately for each and every count, based on the specific evidence submitted," which the Court recognized as an important factor in its decision to permit a consolidated trial. (ECF No. 89 at 5). The Government's Motion, if granted, would allow testimony on seven additional robberies and create a sideshow on whether those can be linked to the charged offenses. The jury's task could move from demanding to daunting, with a possible temptation to treat the alleged crime spree (charged and uncharged) as a monolith. These risks substantially outweigh the probative value, if any, of the weak, generic, and cumulative evidence on the seven uncharged robberies.

For both these reasons, the Government's Motion (ECF No. 41) is **DENIED**.

### III.  CONCLUSION

To summarize the above dispositions: Defendant's Motion to Admit Evidence for Impeachment (ECF No. 50) is **GRANTED IN PART** and **HELD IN ABEYANCE** as to the remainder. All other Motions (ECF Nos. 34, 41, 64, 65, 70, 71, 72, 73, 74) are **DENIED**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: May 23, 2022**