# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| : | |
| Plaintiff, : | Case No. 2:21-cr-053 |
| : | |
| v. : | Chief Judge Algenon L. Marbley |
| : | |
| **RONALD LEE JACOBS,** : | |
| : | |
| Defendant. : | |

## OPINION & ORDER

This matter is before the Court on Defendant's Motion to Exclude Confession (ECF No. 36) and the Government's Cross-Motion to Exclude Testimony of Dr. Leo (ECF No. 61). The Court heard argument on these Motions at an evidentiary hearing on May 19, 2022, and issued an oral ruling. This written Opinion follows. For reasons discussed below and at the hearing, Defendant's Motion to Exclude Confession (ECF No. 36) is **GRANTED**, and the confession is **SUPPRESSED**. The Government's Cross-Motion to Exclude Testimony of Dr. Leo (ECF No. 61) is **DENIED AS MOOT**.[1]

## I. BACKGROUND

These Motions relate to a confession obtained on November 2, 2020, during an interrogation of Defendant by Detective Todd Agee of the Columbus Division of Police. (ECF No. 36 at 1). The full transcript and video recording have been submitted as evidence. (ECF Nos. 53-1, 61-1). The parties do not dispute what occurred in the interrogation room. They do dispute whether that interrogation resulted in a coerced confession.

---

[1] Each party also moved for leave to supplement their filings (ECF Nos. 53, 77, 99). Because these supplements have aided the Court in resolving important evidentiary issues, leave is **GRANTED**. All supplemental filings have been considered in this Opinion.

1

Defendant turned himself in on November 2, 2020, after learning from his father that SWAT officers were searching for him. (ECF No. 36 at 4). The interrogation occurred that same day, "in a windowless room at the police station." (*Id.*). After collecting basic background information, Detective Agee read Defendant his *Miranda* rights and obtained a signed acknowledgement of that fact. (ECF No. 53-1, Tr. 5:10–6:17). Defendant does not claim to have invoked his *Miranda* rights at any later time.

Following the *Miranda* warning, Detective Agee presented the evidence he had gathered on the charged and uncharged robberies at issue. He began with the October 12 Walgreens robbery, one of the last in the string. Detective Agee showed Defendant the surveillance footage, asserted that the stains on the perpetrator's clothing matched the glue stains on the jacket Defendant presently was wearing, and revealed that a matching fingerprint had been recovered from a pack of gum left behind by the perpetrator. (*Id.*, Tr. 17:12–21:22). Defendant denied involvement, stating he was working his job at the Franklin International factory when the robbery occurred. (*Id.*, Tr. 18:12–19:2, 21:23–24). Detective Agee then showed surveillance footage from eleven other robberies, noting similarities in the perpetrator's dress and build; Defendant continued to deny involvement, noting for some that he was working at the time. (*Id.*, Tr. 22:25–35:16).

Over the next several minutes, Detective Agee delivered the statements at the heart of this dispute. Defendant recounts those statements (which the Court has verified against the transcript) as follows:

> He told Jacobs that he knew about Jacobs' prior convictions. He suggested that jurors would not believe that Jacobs was innocent once they saw the fingerprint evidence from the Walgreens robbery because "science is a son of a b–." He told Jacobs that he was going to impound Jacobs' car, get a search warrant for his father's house, "dump everything in that house out," and "toss the whole place" until he found the evidence he needed. Then he would go to the grand jury with "twelve robberies total." Referencing Jacobs' prior stint in prison, Agee said, "You did what, eight years last time? This will be longer . . . that is, unless you

think about what you've done." Other similar comments followed: "You know you're screwed." "[Your three priors] will make you a career violent criminal. And you're what, 44? 43? That's something to think about. Twelve robberies. Armed robberies. If they run them consecutive, if they run them concurrent, that's up to the court, unless you decide to make a decision to own up to what you did."

(ECF No. 36 at 5, quoting interrogation transcript). Defendant mostly did not respond to these statements. Detective Agee then left the interrogation room to "let [Defendant] think about this." (ECF No. 53-1, Tr. 40:21–41:6).[2]

When Detective Agee returned to talk, Defendant made several incriminating statements. He said he "f–d up bad," and gave a motive: that he was "broke" and behind on child support payments. (*Id.*, Tr. 42:3–44:5). He answered that he covered up the shotgun because it was "too big," and that the item appearing to be a pistol "was just s– wrapped up." (*Id.*, Tr. 44:14–16, 45:5–11). Defendant added that he "just got rid of" the shotgun because he "didn't want it." (*Id.*, Tr. 48:17–25). As for the clothing allegedly worn in the robberies, Defendant stated he "threw" his gloves, but directed Detective Agee to the location of his handkerchief, hoodie, and glue-splattered pants: "in the dirty clothes at [his] girl's house." (*Id.*, Tr. 50:15–17, 51:20–53:25). Yet, when asked about his participation in specific robberies, Defendant never gave a direct affirmation. (*See id.*, Tr. 46:15–19 (Detective Agee: "So you remember doing the Hampton Inn twice though, correct, with a shotgun?" Defendant: "Honestly, I don't even remember half of the things I did."), 47:21–23, 49:14–50:1, 50:7–51:8). He denied involvement in one robbery, at a McDonald's (*Id.*, Tr. 49:8–12), which has not been charged.

For the remainder of the interview, Defendant mostly discussed how Detective Agee could obtain consent from his girlfriend, Ms. Tisha Miller, to recover the clothing from her house.

---

[2] The transcript does not indicate clearly when Detective Agee left the room, but the video shows a six-minute break at line 41:6 in the transcript. (*See* ECF No. 61-1 (manual filing of confession tape) at 0:55:50–1:01:50).

3

Defendant repeatedly expressed concern about a search warrant, stating: "I don't want you to go tear up that s–, man" (*Id.*, Tr. 52:10–11), and "I don't want a big scene and all that" (*Id.*, Tr. 63:16).

## II. LAW AND ANALYSIS

Defendant moves to exclude his statements against interest,[3] arguing the "confession was involuntary" and "demonstrably false." (ECF No. 36 at 2). In a later supplement, he offers the testimony of Dr. Richard Leo, a law professor and social scientist, "to testify regarding the scientific literature and studies regarding false confessions generally and then regarding any indicia of false confessions found in the interrogation of [Defendant]." (ECF No. 53 at 2–3). The Government responded in opposition and included a cross-motion to exclude Dr. Leo's testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (ECF No. 61 at 10). The Government later supplemented its Motion (ECF No. 77), and Defendant responded (ECF No. 99). The Court will address these issues in turn.

### A. Motion to Exclude Confession (ECF Nos. 36, 53)

First, Defendant contends Detective Agee obtained an involuntary confession through psychological coercion. If a confession is deemed to be coerced, it "must be excluded whatever may have been the character of the compulsion." *Miranda v. Arizona*, 384 U.S. 436, 462 (1966) (quoting *Wan v. United States*, 266 U.S. 1, 14–15 (1924)). Courts in this Circuit "look[] at the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (internal quotation marks omitted). "[C]oercion can be mental as well as physical." *Blackburn v. State of Alabama*, 361 U.S. 199, 206 (1960). The burden rests on the Government to show "by a preponderance of the evidence

---

[3] In this Opinion, the Court uses "statements against interest" interchangeably with "confession." As Dr. Leo testified at the evidentiary hearing, incriminating statements like Defendant's (*e.g.*, "I f–d up bad") are considered to be a "small c" confession. Defendant did not give a "big C" confession with express admissions and narrative description.

4

that the confession was in fact voluntary." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

> Three factors are required before a confession will be deemed involuntary:
>
> (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

*Id.* "If a defendant has been advised of his *Miranda* rights and voluntarily waived them, it will be difficult to claim that his confession was nonetheless involuntary." *Loza v. Mitchell*, 766 F.3d 466, 478 (6th Cir. 2014) (citing *Missouri v. Seibert*, 542 U.S. 600, 609 (2004) (plurality opinion)). Still, "[t]he requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 444 (2000). The Government notes, and Defendant does not contest, that the statements against interest occurred after Defendant was Mirandized. Instead, Defendant's argument stems from the psychological tactics employed by Detective Agee.

Beginning with the first factor, the Court finds under the totality of the circumstances that this confession was the product of objective coercion. Just before Defendant made the incriminating statements, Detective Agee said the following:

> I'll get a search warrant signed, and I'll go over to your dad's house, **and I will dump everything in that house out** looking for those clothes, and all those clothes there. . . . So -- and this is not a threat. This is not me saying something. This is what I am going to do because I have to find that evidence. I've got to find those guns. And I'll do a search warrant on your dad's house because that's where you're staying, and I'll look for it. **And I'll toss the whole place** until I find my evidence.

(ECF No. 53-1, Tr. 37:25–38:14 (emphasis added)). After Detective Agee uttered these inherently coercive statements, he left Defendant to stew on the matter alone and denied Defendant an opportunity to contact any of his family members. (*Id.*, Tr. 40:9–18 (Defendant: "Can I use the phone?" Detective Agee: "No, given the circumstances, I can't let you use the phone." Defendant:

5

"To call my mom's and them? . . . And my girl." Detective Agee: "That would have to be afterwards.")). Defendant's statements against interest followed.

The Government maintains that merely advising someone of a search warrant is not coercive. While true, this argument misses the mark. Detective Agee had probable cause to execute a search warrant. He did *not* have probable cause to "dump everything in [the father's] house out" and "toss the whole place." No search warrant could be obtained from any judicial officer in the United States that would authorize the police to engage in wanton destruction of property. In fact, the Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures . . . ." U.S. Const. amend. IV (emphasis added). *See also Hill v. McIntyre*, 884 F.2d 271, 278 (6th Cir. 1989) (setting out a "reasonableness" standard for destruction of property incident to a search, and reversing a directed defense verdict in a Section 1983 action where plaintiffs submitted evidence of "a home in total disarray"). Nor was this simply an inartful description of a lawful, reasonable search. *Cf. United States v. Wilkerson*, 76 F. App'x 657, 660 (6th Cir. 2003) (no coercion where police stated they would "'tear the [suspect's] car apart,'" *but* "immediately qualified . . . that the car would be subject only to an exhaustive search") (citing *United States v. Kon Yu–Leung*, 910 F.2d 33, 40–41 (2d Cir. 1990)). Regardless of how Detective Agee characterized his statements (*e.g.*, "this is not a threat"), and regardless of the tone or decibels with which he spoke them, it is the words that matter. Detective Agee's statements were "a real threat," *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993), backed with the full power of the state. Defendant, as a Black man with a history of police contacts, has the lived experience to know it was credible, and this Court lacks the naïveté to deny that. Under all the circumstances, Detective Agee's threat was objective coercion.

On the second factor, the Court finds the nature of this threat was sufficient to overbear Defendant's will. It must be emphasized that these threats were lobbed not only against Defendant, but against his father. A similar setup occurred in *Finch*, where the police threatened (without legal cause) to arrest the suspect's mother and girlfriend, prompting the defendant to make a functional confession. The Sixth Circuit suppressed it, reasoning that "threats to arrest members of a suspect's family may cause a confession to be involuntary." 998 F.2d at 356 (citing *Rogers v. Richmond*, 365 U.S. 534 (1961)). When the stakes are protection of one's family, even the stoics can yield. *See, e.g.*, *Lynumm v. Illinois*, 372 U.S. 528, 531 (1963) (single mother falsely confessed after police said her children "would be taken away"); *Rogers*, 365 U.S. at 536–37 (suspect refused to confess through six hours of interrogation but broke when police reportedly threatened to bring his ailing wife in for interrogation); *Spano v. New York*, 360 U.S. 315, 322–23 (1959) (suspect confessed after eight hours of questioning, on the false suggestion "that his job was in jeopardy, and that loss of his job would be disastrous to his three children, his wife and his unborn child"); *cf. United States v. Ivy*, 165 F.3d 397, 403–04 (6th Cir. 1998) (suspect consented to search after police "chained" his girlfriend to a table and took his child from her arms; court held "that such hostile police action against a suspect's family is a factor which significantly undermines the voluntariness of any subsequent consent given by the suspect").

The same logic applies in this case. By threatening to destroy the home of Defendant's father, Detective Agee created an impossible bind: either confess, or subject your father to an abuse of police power. Any person's will would break in that situation. Here, the breaking point is caught on film. In the video recording, mere seconds after Detective Agee leaves Defendant to "think about this" alone (ECF No. 53-1, Tr. 40:23), Defendant's head collapses heavily into his arms,

7

where he remains largely immobile until Detective Agee reenters the room about six minutes later. (ECF No. 61-1 (manual filing of confession tape) at 0:55:50–1:01:50).

Finally, the confession flowed from the coercion. Defendant broke almost immediately upon Detective Agee's return, admitting "I f–d up bad." (ECF No. 53-1, Tr. 42:3). Then, throughout the second half of the interrogation, Defendant's top concern appears to be protecting his father and girlfriend from a search warrant. (*See, e.g., id.*, Tr. 52:10–11 ("I don't want you to go tear up that s–, man"), 63:16 ("I don't want a big scene and all that")). Instead, he works with Detective Agee to retrieve the clothes from his girlfriend's house voluntarily. The Court is left with little doubt that Defendant internalized Detective Agee's earlier threats and did whatever was necessary to avoid a search warrant.

The Court acknowledges that many other aspects of the interrogation were not inherently problematic. Indeed, without the above-quoted statements by Detective Agee, the confession likely would have been admitted. The entire interrogation occurred within a two-hour span, during which Defendant was not cuffed or restrained. Defendant was Mirandized properly. He is educated, of a mature age, and was not impaired. Defendant even concedes that Detective Agee's "Reid technique" of interrogation, though problematic, is "not per se illegal." (ECF No. 36 at 10). But the threat of police unlawfully ransacking his father's home weighs heavily on the totality of the circumstances. That threat, above all else, was inherently coercive. Moreover, it is precisely the sort of police misconduct that the exclusionary rule is intended to deter. *See Michigan v. Tucker*, 417 U.S. 433, 446–47 (1974) (citing *United States v. Calandra*, 414 U.S. 338, 347 (1974), and *Elkins v. United States*, 364 U.S. 206, 217 (1960)).

Thus, the Government has not met its burden to show the confession was voluntary. The Court finds Detective Agee's threat was objectively coercive, sufficient to overbear Defendant's

8

will, and critical in forcing Defendant to confess. On that basis, Defendant's Motion (ECF No. 36) is **GRANTED**, and the confession is **SUPPRESSED**.

In reaching this conclusion, the Court has conducted its own analysis of objective facts and has not rested on the expert testimony of Dr. Leo. It bears noting, however, that the Court's analysis fits neatly with the theme of "implied threats and implied promises," which Dr. Leo viewed as the most problematic aspect of Detective Agee's interrogation. Detective Agee implied a threat—that he would "toss" the father's house—which was avoidable if (and only if) Defendant confessed and cooperated. At the suppression hearing, Dr. Leo identified the same portion of the interrogation (pages 37 to 41 of the transcript) as most concerning from the standpoint of psychological coercion. And as Dr. Leo testified, those psychological tactics can lead to involuntary statements. Still, the role of Dr. Leo's expert testimony in this case has been to reinforce the Court's legal analysis, not to direct it.

Lastly, because the Court has suppressed the confession as the product of coercion, the Court does not reach Defendant's arguments for exclusion under Rule 403.

### B.  Exclusion of Clothing Articles

Given the Court's suppression of Defendant's confession, a derivative issue arose at the evidentiary hearing: whether the clothing recovered from Ms. Miller's home also falls under the exclusionary rule. Defendant argued at the hearing that the clothes were the tainted fruit of the involuntary confession. The Government opposed exclusion and responded that the clothes were inevitable discovery. The Court indicated it would take the matter under advisement. It now rules that the clothing will not be suppressed.

The exclusionary rule, originally developed in the Fourth Amendment context, "reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also

evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)). The doctrine extends to coerced confessions: "If the statements were 'actually coerced,' then their physical fruits must also be excluded." *United States v. Burton*, 828 F. App'x 290, 293 (6th Cir. 2020) (citing *United States v. Pantane*, 542 U.S. 630, 644 (2004) (plurality opinion)). "[Supreme Court] cases provide that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion) (compiling authorities).

The "inevitable-discovery doctrine" is an exception to the exclusionary rule. It "provides that evidence secured through unlawful means is admissible if the prosecution can show that it 'ultimately or inevitably would have been discovered by lawful means.'" *United States v. Figueredo-Diaz*, 718 F.3d 568, 574 (6th Cir. 2013) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "For example, if a defendant's coerced statement leads police to recover a dead body, evidence of the body, including its condition as shown by the autopsy, is admissible at trial if the prosecution shows that the body would have been discovered lawfully, by other means such as a volunteer search already underway that would have covered the field where the body was located." *Id.* (citing *Nix*, 467 U.S. at 444–50). The Government bears the burden of proving inevitable discovery by a preponderance of the evidence. *Nix*, 467 U.S. at 444.

Like *Nix*, Defendant's clothing would have been discovered without the coerced confession. As it occurred, the recovery did result directly from the confession; once Defendant yielded to the coercion, he disclosed the location of the clothing ("at my girl's house") and cooperated with Detective Agee to retrieve it without a search warrant. (ECF No. 53-1, Tr. 53:22–

10

67:16). Detective Agee evidently did not have the name or address of Ms. Miller at the time. (*Id.*, Tr. 56:18–23, 58:9–19, 61:17–20). Certainly, though, he had direct and active leads. Early in the interview, before any allegedly coercive tactics, Defendant volunteered that he had a girlfriend and shared information about her work. (*Id.*, Tr. 13:15–14:9). After some of the incriminating statements—but before Defendant disclosed the location of the clothing—Detective Agee had narrowed the possibilities to three. (*See id.*, Tr. 51:20–22 (Detective Agee: "Where's that – where's the handkerchief at now? Is it in your car, or at your dad's house, or at your girl's place?")).

Detective Agee was prepared to impound Defendant's car and execute a search warrant on his father's house. (*Id.*, Tr. 38:10–15). If those did not return the clothing, the obvious next steps in the investigation would be to learn the identity of Defendant's girlfriend and execute a warrant on her house. Neither would have been difficult, given the information volunteered by Defendant early in the interview. Nor would the clothing have been overlooked in a search of Ms. Miller's house. It was in the expected place (*see id.*, Tr. 52:6–7 ("Probably in the dirty clothes")), and Detective Agee knew specific items to look for from his review of the surveillance footage.

Thus, all indications are that the evidence would have emerged without the coerced confession. The Court therefore holds that the inevitable-discovery doctrine renders the clothing **ADMISSIBLE**, despite the constitutional infirmity of Defendant's confession.

### C. Motion to Exclude Testimony of Dr. Leo (ECF Nos. 61, 77)

Next, the Court addresses the Government's Motion to Exclude (ECF No. 61), concerning the proposed testimony of Dr. Leo on false confessions and potential indicia thereof. The Government contends Dr. Leo's testimony is unreliable and irrelevant, thus barring its admissibility under Rule 702. Alternatively, the Government moves for exclusion under Rule 403,

citing the risks of unfair prejudice, confusion, and delay. The Court heard argument on these issues during the *Daubert* portion of the May 19 evidentiary hearing.

In light of the Court's suppression ruling, this Motion is moot; Defendant reported at the hearing that Dr. Leo would not be called at trial if the confession is excluded. Nonetheless, the Court will proceed to address the Government's challenge in order to explain why Dr. Leo's testimony was admitted at the suppression hearing. As detailed below, the Court was prepared to admit Dr. Leo's testimony at trial, had the confession also come into evidence. *A fortiori*, Dr. Leo's testimony was appropriate for the suppression hearing.

*1. Reliability and Relevance*

Together, Rule 702, *Daubert*, and *Kumho Tire* establish that district courts may admit expert testimony if it satisfies three requirements. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (describing district courts' "responsibility of acting as gatekeepers to exclude unreliable expert testimony"). "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'" *Id.* at 529 (quoting Fed. R. Evid. 702). "Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting Fed. R. Evid. 702). "The relevance requirement ensures that there is a 'fit' between the testimony and the issue to be resolved by the trial." *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999). "Third, the testimony must be reliable." *Scrap Metal Antitrust Litig.*, 527 F.3d at 529. The reliability requirement "focus[es] on the methodology and principles underlying the testimony." *Greenwell*, 184 F.3d at 496–97. The "proponent" of the expert testimony "must establish its admissibility by a preponderance of the proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

Dr. Leo's research focuses on "the psychology of interrogations and confessions, psychological coercion, and police-induced false confessions." (ECF No. 99 at 2). Dr. Leo is among the most preeminent scholars in that field. He has written 7 books, along with 101 articles and other publications, many being peer-reviewed. (*Id.* at 4; ECF No. 53-3). He has been qualified as an expert in approximately three dozen cases since May 2018, in state and federal courts across the country (ECF No. 99-1), and has testified almost 400 times over his full career. His work even has been cited by the Supreme Court. *See Corley v. United States*, 556 U.S. 303, 321 (2009) (citing Drizin & Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C.L.Rev. 891, 906–907 (2004)). At trial, Dr. Leo would "help the jury (1) understand the reasons why (counterintuitively) individuals may falsely confess to a crime they did not commit; (2) understand how the interrogation of Mr. Jacobs was psychologically coercive; and (3) recognize the situational and personal risk factors associated with false confessions." (ECF No. 99 at 2–3).

The Government's challenge centers on reliability and relevance. In support, they cite several cases in which courts have excluded Dr. Leo's testimony under *Daubert* and Rule 702. These cases identify some limitations with Dr. Leo's methodology. Since Dr. Leo begins with confessions that are demonstrably false and then "'works backwards' to find commonalities," *People v. Kowalski*, 821 N.W.2d 14, 31 (Mich. 2012), his research cannot conclusively distinguish tactics "effective in inducing true confessions" from those that lead to false confessions. *State v. Wooden*, 2008 WL 2814346, at *4 (Ohio Ct. App. July 23, 2008); *see also United States v. Deuman*, 892 F. Supp. 2d 881, 888 (W.D. Mich. 2012) (characterizing Dr. Leo's testimony as "guesswork" because "coercive interrogation techniques may lead to false confessions but also produce true confessions . . . so the confession or incriminating statements may or may not be false"); *United States v. Phillipos*, 849 F.3d 464, 471–72 (1st Cir. 2017) (discussing this line of

cases and affirming Dr. Leo's exclusion against an abuse of discretion standard). Yet even when excluding Dr. Leo's testimony, courts have recognized that false confession research is an area of split authority. *See, e.g.*, *State v. Cobb*, 43 P.3d 855, 868 (Kan. Ct. App. 2002); *Scott v. State*, 165 S.W.3d 27, 57 (Tex. Ct. App. 2005).

As the gatekeeper of evidence in this case, the Court finds these limitations on Dr. Leo's methodology are better addressed through cross-examination than exclusion. Dr. Leo's work has been extensively published and peer-reviewed, and it has earned him expert admissions in many other courts. This indicates to the Court that his work is not the sort of "misleading 'junk science'" that *Daubert* seeks to exclude. *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009). Rather, it is an established field of scholarship with consensus methods and findings—as evidenced by the "white paper" Dr. Leo co-authored for the American Psychological Association. "[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 (Advisory Committee Notes, 2000 Amendments). The "traditional and appropriate" remedies, which the Court would employ here, are "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

The Court also rejects the notion that Dr. Leo's research would be unhelpful to the jury or would invade its factfinding province. Though some courts have excluded Dr. Leo on this ground,[4] their holdings are not readily reconciled with Dr. Leo's research (which the Government has not rebutted) on the gap between the observed reality of false confessions and the belief "[m]ost lay people" hold, "that an innocent person will not falsely confess to police unless he is physically tortured or mentally ill." Richard A. Leo, *False Confessions: Causes, Consequences, and*

---

[4] *See, e.g.*, *Vent v. State*, 67 P.3d 661, 669 (Alaska Ct. App. 2003); *Cobb*, 43 P.3d at 869; *State v. Davis*, 32 S.W.3d 603, 609 (Mo. Ct. App. 2000).

*Implications*, 37 J. Am. Acad. Psychiatry Law 332, 333 (2009). In the Court's view, "there is no question that Dr. Leo has specialized knowledge that is not within an average juror's bank of knowledge or experience." *United States v. Hayat*, 2017 WL 6728639, at *11 (E.D. Cal. Dec. 27, 2017). That expertise will assist the jurors in assigning appropriate weight to the confession—based not on preconceived notions, but on a careful evaluation of the facts before them. Dr. Leo will not, however, intrude on the final determinations with which the jury is entrusted. Defendant represents that "Dr. Leo will not opine as to whether Mr. Jacobs'[s] confession was in fact false nor will he opine on the credibility of any witnesses." (ECF No. 99 at 3). Dr. Leo confirmed those parameters at the evidentiary hearing.

For these reasons, the Court concludes that Dr. Leo possesses expert knowledge and that his research is sufficiently reliable and relevant to clear the threshold of *Daubert* and Rule 702. His testimony therefore is admissible.

2. *Unfair Prejudice*

The Government alternatively asserts that Dr. Leo's testimony should be barred under Rule 403 because its probative value is substantially outweighed by the risk of unfair prejudice, confusing or misleading the jury, or undue delay. (ECF No. 61 at 19–20). The Government again cites *Deuman*, recognizing the "danger . . . that the jury may conclude that Defendant's incriminating statements were false not because there is a sound evidentiary basis for doing so, but because Dr. Leo, an impressively-credentialed expert, says 'it is so.'" 892 F. Supp. 2d at 888.

That "danger," however, is inherent in all expert testimony and is addressed by standard safeguards. Consistent with *United States v. Johnson*, 488 F.3d 690, 697–98 (6th Cir. 2007), Dr. Leo would be tendered not as an "expert witness," but an "opinion witness." The jury also would be instructed that it may give Dr. Leo's opinions whatever weight they deserve, and that it may

15

reject his opinions altogether if they are unsound or outweighed by other evidence. Moreover, Dr. Leo would not actually say "it is so." The briefing represents he will testify on false confessions generally and on risk factors present in Defendant's interrogation, but he "will not opine as to whether [Defendant's] confession was in fact false." (ECF No. 99 at 2–3).

Nor would the Court exclude Dr. Leo based on the time required for the Government to "review . . . Dr. Leo's work and methodology" on cross-examination. (ECF No. 61 at 19). This too is a generic issue encountered with any expert witness—including the Government's two fingerprinting experts. (*See* ECF No. 76). Time is not "wast[ed]," and delay is not "undue," Fed. R. Evid. 403, where the expert testimony speaks to core contested issues on which the case, and Defendant's liberty, may turn.

Accordingly, the Court was prepared to permit Dr. Leo to testify at trial, within the scope of his expertise. By extension, the Court could receive his testimony at the suppression hearing. Since Dr. Leo will not be called at trial, however, the Government's Motion to Exclude (ECF No. 61) is **DENIED AS MOOT**.

### III.  CONCLUSION

For the reasons stated herein, Defendant's Motion to Exclude Confession (ECF No. 36) is **GRANTED**, and the confession is **SUPPRESSED**. This ruling does not extend to the recovered articles of clothing, which were inevitable discovery. The Government's Motion to Exclude Testimony of Dr. Leo (ECF No. 61) is **DENIED AS MOOT**. Finally, leave is **GRANTED** for all the supplemental filings considered herein (ECF Nos. 53, 77, 99).

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: May 24, 2022**